72183, Indra Sihotang v. Jefferson B. Sessions. Good morning, Your Honors, and may it please the Court. My name is Jesse Thompson and I represent the Petitioner, Indra Sihotang. A relatively simple question before this Court is whether the Board of Immigration Appeals abused its discretion when it denied my client's reopenance removal proceedings that was based on evidence of changed country conditions in Indonesia. The central issue thus before Your Honors is how the conditions for evangelical Christians worsened enough to re-examine an application for protection. To approach this question, the Court- What's our standard of review as to the BIA's determination that there was no substantial change in country conditions? It is abuse of discretion, Your Honor. To approach this question, the Court may use the parable of the frog in a pot of water. If the frog grew up in water- Mr. Thompson, I'm sorry to interrupt you because you're either mumbling or your mic is not high enough. Excuse me. Oh, thank you. To approach this question, the Court may use the parable of the frog in a pot of water. If the frog grew up in water and generally feels comfortable there- It's not in the pot. So this Court does not have to wait until the proverbial frog is dead in order to decide that the water in the pot he is in is hot. This Court's series of cases in the national jurisprudence on this issue is clear, an indication that conditions have significantly changed as one is required to re-open removal proceedings in this context. Significant change is always going to be a shifting and hard to discern line, which is why the frog in his pot can be instructive. The evidence in the record indicates that the water Mr. Sioteng would be placed in in Indonesia is uncomfortably hot right now. It does not have to be deadly for Your Honors to re-open this case. In this case, the Board issued a superficial denial of Mr. Sioteng's motion to re-open that did not address, even in passing, evidence in the record that demonstrated the drastic and significant changes in Indonesia that warrant re-opening in this application. What is the key determinant? You say that this is an incremental process so that there is a tipping point. What was the tipping point in this case? What made the change in country conditions material? Because as you know, we have a series of cases that precede these cases where we upheld the Board's determination that country conditions in Indonesia have not changed materially. Yes, Your Honor. The tipping point in this case would be in 2016 and 2017 when a very popular Christian governor of Jakarta was jailed for blasphemy. There were also historic protests in the capital that both preceded and postdated his arrest and conviction. Both of those events occurred more than a year after this Court's last decision on this particular issue. The protests were historic in size, in location, and in their nature. There were first more than 100,000 people protesting in the capital after the governor of Jakarta whose nickname was Dahok, had made statements that were generally not necessarily pro-Christian or anti-Muslim in nature. They were simply a wish for voters to vote their consciousness instead of to follow what hardline Muslim clerics had instructed them to do. For those relatively tame statements, he was jailed and convicted of blasphemy and after his arrest and while the trial was going on, there was around half a million people protesting in the capital of Jakarta. Could you walk us through the country report? Because I understand that there was a 2006 State Department report and then there's a more recent one. Is it 2014? Yes, Your Honor. The 2006 country commissioners report is the report that was submitted first at Mr. Sietang's original removal hearing and that report indicated that there was a relatively robust freedom of religion in Indonesia. Could you be more specific? That report I believe contained a statement that the government generally respected freedom of religion. Yes, Your Honor. Was that in the 2014 report? The instructive country commissioners report that's relevant to this most recent motion to reopen is a 2016 country commissioners report and that country commissioners report contains no such evidence or no such statements. And to me that's fairly instructive of the United States State Department does not believe that Indonesia at this moment enjoys a relatively robust freedom of religion. And could you talk a little about this adoption of Sharia law? Yes, Your Honor. When did that happen? The idea of Sharia law on a federal level in Indonesia was first introduced in around 2004 or 2006, I believe. It was introduced and discussed in the Congress at that time. It was not passed by the national government of Indonesia in those years, in 2006. Later in, I believe, 2009, Sharia law was passed and implemented on a federal level. And to me that is a further indication of the support of a theocracy, honestly, in Indonesia that was not present and not happening in 2006 or 2007 when Mr. Sia Teng's national removal proceeding was conducted. So Sharia law was passed, but what's the relationship between the passage of Sharia law and the impact on the Christian population as far as exercising their religious rights? The passage of Sharia law and the allowance in Indonesia of religious courts to conduct trials and convict people is relevant to freedom of religion for a relatively simple proposition, which is that if you can be tried simultaneously by the national secular court and also by any statement that might be seen as anti-Muslim in nature would actually be tribal in the federal state court as well. So any non-Muslim at this point can be brought into a religious Sharia law court on a charge? I am not sure exactly how the Sharia law courts operate in Indonesia, so I'm not sure exactly that a non-Muslim could be brought before that court. What I'm trying to explain is that I believe that the existence of a Sharia law court allows for a lot more very direct and clear influence on the secular courts, which is evidence I believe by the conviction of the very popular governor of Jakarta for his relatively tame statements that were not anti-Muslim in nature, but ended up with a conviction for blasphemy. And do I understand that Sharia law at the time of your client's original removal hearing was in effect in two provinces in Indonesia, but was federalized after his hearing in 2009 or 2010? Yes, and that is true, and that is also instructive I believe as to the description of the rest of the events in this case, because the very strong anti-Christian or pro-Muslim beliefs that were present in the provinces back in 2006 and 2007 are now at the center of the country in Jakarta, evidenced by half a million people protesting in the streets. So it is yes, the law has changed, but that is also very true and can be seen in the actual culture as well. Do these changes in country conditions, in your view, peculiarly impact your client because his profession of the Christian religion is evangelical in nature? Yes, it is clear that my client's particular practice of religion, because it is evangelical in nature, he will be impacted in unique ways. What is very dear to his faith is the proselytizing and spreading of what he believes to be the word of God, and he is in effect unable to practice his religion if he cannot evangelize what he believes to be the true faith. That actual specific conviction of his puts him in unique danger because of the fact that he is going to be walking around and actually trying to convert people to Christianity. The conviction of a very popular governor who is not even evangelizing in any way is, I think, a dangerous explanation for what could happen to my client, who is going to be a lot more specifically pro-Christian and will be taken as anti-Muslim, even though that is not where his beliefs come from. Was the evangelical nature of your client's religious beliefs brought up in the course of his original removal hearing? I don't believe that the evangelical nature of it was. He was actually attacked for being Christian before he came to the United States. I'm not sure, and I don't know if there is evidence in the record or not, to base that attack on evangelizing, but it was based on the fact that he was Christian. There is some suggestion by your client that the fact that he had been in the United States would exacerbate the likelihood of persecution. What was the support for that? My client has been in the United States now for 15 years. He has four children who are United States citizens, and his wife is half ethnically Chinese. All three of those facts are very clear indications to the population of Indonesia that he is in fact Christian. People in Indonesia view people who spend a lot of time in the United States as inherently more Christian just because they spend time here. That's just the way that he is viewed, and that's the way that anybody with his particular history would be viewed, in part because of his family and because of his long time in the United States. Is that answer related to his family composition? I'm trying to figure out if he goes back, because his wife is Chinese-Indonesian also, so presumably she speaks the language. So how would they know that they've spent time in the United States? Just due to the fact that he has spent all this time in the United States. He has very little family support left in Indonesia, and I don't know for sure, but I believe he speaks with an accent now because he spent the last 15 years speaking English in the United States. And his children speak English? Excuse me? His children speak English? His children speak English, and they do speak a little bit of Indonesian, but they're all in school and speak English in the United States. Thank you. May it please the Court, Abigail Leach for the Attorney General. Ms. Leach, could you start by answering Judge Selye's first question about when does it reach a tipping point for deciding that there's been substantial change, and why isn't it my question, why wouldn't it be met here? Your Honor, I don't know of a hardline rule, but I do know of a hardline rule that says of a material changing country condition. Let's start with the facts of this case, then, as to why this isn't it. Opposing counsel points to the Christian governor arrest in Jakarta in 2016 as a critical moment of tipping point for the change in country conditions. However, the article that was submitted in support of his motion to reopen discussing this arrest specifically stated that this does not mean Indonesia is lurching in a violently Islamist direction. Also in that article is a quote that says the residents who addressed, I mean, who attended the protests and demonstrations claimed that their problem with the governor was not due to his perceived blasphemous anti-Muslim remarks, but rather his callous treatment of those residents. So I would not say that... His callous treatment of what? Of the residents of Jakarta. That's all that the article said, so I don't have more details on that. But it's a pretty big fact that in time period one, when you're looking at how a Christian is treated in a country, and there's a Christian governor of a prominent province that suggests, well, there's a certain level of treatment. When you get to time period two, and that same person is not only not governor anymore, which would take away that fact, but that person is in prison for blasphemy, that's a pretty big, at least, warning sign, isn't it? I would say that the board's decision to characterize all the evidence as a continuation of conditions for Christians in Indonesia is not an abuse of discretion. It wasn't an irrational finding. But a continuation doesn't answer it. Because you can have a material change, which is a continuation, if the continuation makes things materially worse. And the government's position here is that it's not materially worse? I understand that's the government's position. But the board doesn't give us a lot of help. I mean, to describe the board's decision on this matter as cursory is probably to understate it. I mean, we've got not only the facts concerning the Christian governor, but we also have the expert opinion that's been submitted, where someone whose credentials have not been attacked insofar as I can tell in the record, has attested that in his expert opinion, as an expert on Indonesian matters, there has been a material change in country conditions. In addressing that expert opinion, first I'd like to note that many of the quotes from his affidavit were not quotes from the actual country conditions reports, but were his own general opinions and conclusory statements about the conditions. That's what experts do. That's true. We get it not only from experts, but we get some of our opinions. And in addition, this court has also noted that in strikingly similar cases to this one, they submitted Dr. Winter's affidavit in support of showing changed country conditions in Indonesia and in actually Lee, the case of Lee in 2013 cited a Third Circuit case named Sotiono. I'm sorry, I'm butchering that name. It is not the State Department reports that are to be relied on in appropriate in addressing country conditions and not the affidavit of Dr. Winters. No, but you're not suggesting that affidavits of experts are inadmissible. I'm not, no. So that if they're admissible, we have to give them some weight. Sure, the country conditions reports are the statements. But as your brother pointed out, there is a material omission from the 2016 country condition report as compared to the earlier one. And I believe you're addressing the general religious freedom omission, but actually it has been explicitly stated in those words. But on page 18 of the 2016 country condition report, it specifically says many in the media, civil society, and general population were vocal and active in promoting tolerance and pluralism of religion. That's a little different than what they said earlier. How about the statement in the 2006 report, the government sometimes tolerated religious extremists, and then that gets deleted. And then there's a statement that Asha province is the only authorized sharia, and that gets deleted. And then there's a statement that most of the population enjoyed a high degree of religious freedom, and that seems to have been deleted. Actually, Asha province in 2016 was still the only province that was permitted to use sharia law in its local regulations, although other, approximately 30 in 2006 and in 2016 did implement it in their local regulations. Let me go back to your first point, which I thought was a good one, which is that we should avoid general rules and look at the specifics here. As I understand the thrust of the petitioner's complaint here, he's not saying he's Christian. He's saying he's evangelical Christian. And he's not saying he's just an ordinary evangelical Christian. He's saying one who's been in the United States for a long period of time and would therefore have a badge that would help identify him as such. And lastly, he's saying that his wife, because she's Chinese ethnicity, that Chinese ethnicity is highly correlated or perceived as being correlated with being Christian in Indonesia. And so he's saying he's got all these simple pointing at him that makes him even more likely to be persecuted. Is there anything in the board's report that can assure us that the board dealt with his case as presented in that manner? I saw no acknowledgment of the difference between evangelical, Christian, and Christian, et cetera. In the board's decision, they didn't specifically discuss the evangelical nature. But as an anecdotal point, I'd like to point out that- Did they discuss it at all? He didn't. Not specifically, but he did point to- You said not specifically. Did they discuss it at all? Well, he referenced the tabs in the exhibits submitted in support of the 2006 merits hearing and also specifically referenced the evidence that was supported in the 2017 motion. So, although he didn't explicitly state it, the board is not required to parse out each individual piece of information. Let me, before I forget to do it, do you agree that our determination as to whether or not the board's conclusion that there has been no material change in country conditions, I would humor that as for an abuse of discretion. Yes, I do agree it's an abuse of discretion. That's right. And it cannot be said that based on the record provided at the 2006 merits hearing and the 2006 motion to reopen, that the board acted irrationally in finding that there was no material change, but rather a mere continuation of conditions for Christians in Indonesia. To address Judge Thompson's question about Sharia law, in the 2016 report it does- the House of Providence gave out a statement that said that Sharia law does only apply to Muslims. However, people could elect to be punished under Sharia laws, as one woman did for stealing and her punishment would have been paying a fine, and she was Christian, so she couldn't afford that, so she elected to be punished under the Sharia law. But it does only apply to Muslims. In addressing the idea that- So the governor was prosecuted in a federal court? I'm not sure, Your Honor. I'm not sure. But to address the idea that Sharia law was present in 2006 during his merits hearing and has continued to be present during the 2016 country conditions report, that Sharia law at the federal level was being reviewed by Parliament in 2006, originally enacted in 2004, or brought on the table in 2004, and continued to be reviewed from 2004 until its passage in 2008. So that- Isn't there a difference between looking at it and adopting it? It's being reviewed, negotiated, considered, and it never left the table- remained on the table. But that doesn't answer Judge Thomas' question. Isn't there a difference between a law being considered and a law being adopted? I would say that considering the law is an evidence of the idea of having Sharia law present at the federal level. That doesn't answer the question. I mean, I don't see why it's so hard for you people to admit that yes, there's a difference between considering a law and enacting a law. Of course there's a difference between them. I'm not saying that the consideration isn't some evidence that helps you, but it's different. It's different than passing it. There are people in Congress who are considering abolishing ICE. It's not the same thing as abolishing it. I'd have to agree. In addressing that there was a significant increase in violence in Indonesia, the 2017 United States Council on International Religious Freedom specifically stated that Indonesia remained on a Tier 2 for countries of particular concern from 2004 and remains there in 2017 evidencing an independent opinion that conditions did not materially change, but were a continuation for Christians in Indonesia. Wasn't that a 2017 opinion before the board? Yes, it was. It was submitted with a motion that I respectfully request for this court. Does the Attorney General retain any residual discretion of any type that would potentially be applicable to petitions such as this one? The Attorney General does not. In the event of the denial of the petition for review, the petitioner himself could approach the Department of Homeland Security and ask for prosecutorial discretion. So it is, the Attorney General does have some residual discretion that could apply to cases? I apologize, I misunderstood. Yes. But the Attorney General has already exercised his discretion by revoking the procedure that was in place before. He was showing up regularly and reporting, and he showed up and then he got taken into custody, right? That's right. And this has happened to all Indonesians who had that temporary legal status? Yes, Your Honor. For certain Indonesians, yes. But based on the record before the court, it cannot be said that the board abused its discretion or acted irrationally in finding that there was not a material change in country conditions for Christians in Indonesia. Thank you, Counselor. Thank you.